# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. CR 09-2474 RB |
| | ) | |
| GARFIELD WAYNE BERNARD | ) | |
| and JULIO ANTONIO CAMPBELL, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## AND ORDER REGARDING MOTIONS

**THIS MATTER** is before the Court on Defendant Julio Antonio Campbell's (Mr. Campbell's) Motion for Independent Analysis (Doc. 49), filed on January 12, 2010; Defendant Garfield Wayne Bernard's (Mr. Bernard's) Motion to Suppress All Evidence Relating to Trailer Seal (Doc. 50), filed on January 15, 2010; Mr. Bernard's Notice of Brady Request (Doc. 51), filed on January 15, 2010; and Mr. Bernard's Motion to Suppress Evidence and Statements (Doc. 53), filed on January 15, 2010.[1]

The Court held an evidentiary hearing on April 26, 2010. Having considered the submissions of counsel, evidence adduced at the hearing, relevant law, and being otherwise fully advised, the Court issues these following findings of fact and conclusions of law and denies the Motion for Independent Analysis and the Motion to Suppress All Evidence Relating to Trailer Seal, grants the Brady Request, and denies the Motion to Suppress Evidence and Statements as to all issues other than the issue of selective enforcement. The Court grants Defendants' request for discovery and reserves ruling on the issue of selective enforcement.

---

[1]  Mr. Campbell has joined in Mr. Bernard's motions.

**FINDINGS OF FACT**

1.      The Indictment, filed on August 27, 2009, charges Defendants with (1) conspiracy to commit possession with intent to distribute more than 100 kilograms of marijuana, in violation of 21 U.S.C. § 846, and possession with intent to distribute more than 100 kilograms of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), and aiding and abetting, in violation of 18 U.S.C. § 2.

2.      At the evidentiary hearing, New Mexico Motor Transportation Division ( NMMTD) Officer Benjamin Strain, DEA Special Agent Darren Rhoden, and New Mexico State Police Task Force Officer Phillip Candelaria testified on behalf of the United States.  Gilbert Apodaca, an investigator with the Federal Public Defender's Office in Las Cruces, testified on behalf of Defendants.  Government Exhibits 1, 2, 3, 4, 5, 6, 7, 8, and 9, as well as Defendants' Exhibits A, B, C, and D were admitted without objection.

3.      Officer Strain started his employment with the NMMTD as an inspector in May, 2003.  In December, 2005, he graduated from "the academy" and became a credentialed NMMTD officer.  An NMMTD officer has arresting authority and is trained in law enforcement techniques.  Officer Strain has served as an NMMTD officer at the Lordsburg, New Mexico, Port of Entry, located on eastbound Interstate 10, since December 2005.

4.      On May 28, 2009, Officer Strain worked the evening shift, from 4:00 p.m. to midnight, at the Lordsburg Port of Entry.  Officer Strain stood in the drive window of the inspection station.[2]  Officer Strain, or another NMMTD employee, must run the Department of Transportation (DOT) number on each truck that passes through the port of entry.  Additionally, NMMTD officers

---

[2] Defense Exhibit A depicts the drive window by the stop sign at the inspection station.  Defense Exhibit B shows trucks lined up at the stop sign by the drive window.

are required to perform five inspections per eight-hour shift.  Officer Strain normally performs approximately eight inspections during an eight-hour shift.

5.       Officer Strain explained that, during a Level III inspection, an NMMTD officer checks insurance documents, logbooks, bills of lading, medical cards, and commercial drivers' licenses, as well as verifying that the cargo conforms to the bill of lading.  Officer Strain testified that a Level III inspection at the Lordsburg Port of Entry includes cargo verification to determine whether the contents of the load match what is on the bill of lading.  It is Officer Strain's practice to verify the cargo on a fairly high number of his inspections.

6.       At about 10:00 p.m., Officer Strain randomly selected Defendants' tractor-trailer for a Level III inspection and cargo verification, as it approached the inspection station on the drive ramp entrance to the port of entry.  As the tractor-trailer pulled up to the inspection station drive window, Officer Strain observed there were two men in the tractor, the male driver and a man in the passenger seat.  Officer Strain asked Mr. Bernard, who was the driver, for documentation.  Mr. Bernard handed over his logbook, truck registration, and bill of lading.

7.       Officer Strain asked Mr. Bernard to identify the passenger, and Mr. Bernard stated the passenger was the co-driver.  Officer Strain found it unusual that a co-driver was sitting in the passenger seat.  Officer Strain explained that when a driver/co-driver team operate a commercial vehicle, one of them usually drives while the other sleeps in the sleeper berth of the tractor.

8.       Officer Strain asked Mr. Bernard to park the tractor-trailer inside the inspection bay[3] and bring the rest of his documentation, as well as the documentation for Mr. Campbell, to Officer Strain inside the port of entry office.  Mr. Bernard complied with these instructions.

---

[3]   Defense Exhibit C shows the truck inspection bay.

3

9.      As Officer Strain entered the information into the computer inspection system, he noted that Mr. Bernard's logbook showed a 14-hour violation on May 28th.  Officer Strain cited Mr. Bernard for the 14-hour violation, which is fairly routine.  Additionally, Officer Strain found it unusual that Mr. Bernard and Mr. Campbell had both logged sleeper berth time for the same hours. Officer Strain noticed that the bill of lading provided a description of the contents of the load as well as a typed seal number.

10.      Officer Strain walked from the port of entry building to the tractor-trailer parked in the inspection bay, a distance of less than 100 yards.  Officer Strain had directed Mr. Bernard to meet him there for the trailer inspection.  As Officer Strain approached the back of the trailer, he observed there was a large padlock on the right trailer door, but no seal.[4]  The bill of lading indicated that a numbered seal should have been on the trailer.  Officer Strain asked Mr. Bernard why there was no seal attached to the trailer door.  Mr. Bernard responded that the shipper had not put a seal on the load.  Mr. Bernard stated that the shipper gave him the padlock to secure the load.

11.      Officer Strain asked Mr. Bernard to open the rear doors of the trailer.  Mr. Bernard used a key he had in his possession to unlock the padlock.  At Officer Strain's request, Mr. Bernard opened the trailer doors and secured one door to the side of the trailer.  Inside the trailer doors, Officer Strain saw two wooden pallets stacked with labeled cardboard boxes.  The labels appeared to be similar to each other, the stacks of boxes had corner braces, and the stacks were wrapped tightly with clear plastic.[5]

12.      Officer Strain realized, as the boxes were stacked fairly high, he would need a ladder

---

[4]   Government Exhibit 1 depicts the padlock on the rear doors of the trailer.

[5]   Government Exhibit 2 shows the two wooden pallets with the stacks of labeled boxes.

to look into the trailer beyond the stacks of boxes.  Officer Strain walked to the barrier in the inspection bay to retrieve a ladder.  As Officer Strain returned to the rear of the trailer, Officer Strain observed Mr. Bernard pacing back and forth in a nervous manner.  Officer Strain asked Mr. Bernard to stand on the left side of the trailer.

13.     Officer Strain used the ladder to climb up on top of one of the stacks of labeled boxes. Officer Strain noticed a void beyond the stack of boxes on the right side.  Beyond the void, were additional stacks of labeled cardboard boxes of the same appearance as the stacks of labeled cardboard boxes near the doors.  The labeled boxes appeared to be similar to each other, the stacks of boxes had corner braces, and the stacks of labeled boxes were wrapped tightly with clear plastic.[6]

14.     Officer Strain used the ladder to climb on top of the first stack of boxes on the pallet on the right side of the trailer to look inside the void.  There was just enough space between the top of the labeled boxes and the roof of the trailer for Officer Strain to lay down and move forward toward the front of the trailer.  Inside the void, Officer Strain saw cardboard boxes of a different size and type than the other boxes.  The tops of the boxes in the void were lower than the other stacks, indicating that the boxes were smaller than the labeled boxes.  Additionally, the boxes in the void were unlabeled, they had no markings of any kind, they lacked corner braces, and they were loosely wrapped with clear plastic wrap.[7]

15.     Officer Strain climbed down onto the boxes in the void, used his knife to cut open one of the boxes, and saw packages of what appeared to be contraband.  Officer Strain cut into one of the packages and immediately smelled marijuana.

---

[6]   Government Exhibit 3 shows the void and the legitimate cargo beyond the void.

[7]   Government Exhibit 4 depicts the boxes in the void.

16.     Officer Strain climbed out of the trailer, drew his sidearm and ordered Mr. Bernard to the ground.  Mr. Bernard immediately complied.  Officer Strain holstered his sidearm, handcuffed Mr. Bernard, stood Mr. Bernard up, and read Mr. Bernard his *Miranda* warnings.  Officer Strain informed Mr. Bernard that agents from the New Mexico State Police Task Force would arrive in a short time, Officer Strain could not promise Mr. Bernard anything, and Mr. Bernard should think about what he would say to the task force officers.  Mr. Bernard stated he was not going "to take this where it's supposed to go."

17.     Mr. Campbell was inside the lobby area of the port of entry during the search of the trailer and the arrest of Mr. Bernard.  After arresting Mr. Bernard, Officer Strain escorted Mr. Bernard to the entrance of the port of entry building and asked NMMTD Officer Elias to stand with Mr. Bernard while Officer Strain arrested Mr. Campbell.  After arresting and handcuffing Mr. Campbell, Officer Strain secured Mr. Campbell to the bench by the administrator's office.  Officer Strain secured Mr. Bernard to a bench by a different office.

18.     Officer Strain and Officer Elias removed the boxes in the void from the trailer.[8] Officer Strain and Officer Elias performed a tow inventory of the tractor.  Inside the tractor, Officer Strain found a black overnight bag (black bag) located behind the passenger seat in an open cabinet.[9] The bag was closed when Officer Strain found it.  Officer Strain opened the black bag and inside found a blue seal with numbers (0900594) matching the numbers on the bill of lading.[10] Additionally, Officer Strain found toiletry items inside the black bag.  Officer Strain does not recall

---

[8]   Government Exhibit 5 shows the nine boxes after they were unloaded from the trailer.  These boxes contained approximately 595 pounds of marijuana.

[9]   Government Exhibit 6 depicts the black bag where it was found in the open cabinet.

[10]   Government Exhibit 7 depicts the black bag and the blue seal after Officer Strain removed the seal from the bag.

if the black bag remained in the truck, or if he took it inside the port of entry building. The seal was logged as evidence, but the black bag was not.

19.     New Mexico State Police Officer Phillip Candelaria testified that he and Border Operations Task Force Agent Corey Watkins interviewed Mr. Bernard and Mr. Campbell separately at the Lordsburg Port of Entry. At the start of Mr. Bernard's interview, at 3:12 a.m. on May 29, 2009, Officer Candelaria read the standard *Miranda* warnings and Mr. Bernard signed the statement of rights form. [11] Officer Candelaria and Agent Watkins interviewed Mr. Bernard. At the start of Mr. Campbell's interview, at 3:45 a.m. on May 29, 2009, Officer Candelaria read the standard *Miranda* warnings and Mr. Campbell signed the statement of rights form. Officer Candelaria and Agent Watkins interviewed Mr. Campbell. Each Defendant initialed and executed his waiver of rights form.

20.     Officer Candelaria and Agent Watkins signed the forms. During the interviews, the Defendants were not handcuffed, not in pain, and not intoxicated. Neither Officer Candelaria nor Agent Watkins intimidated or threatened Defendants. Mr. Bernard and Mr. Campbell appeared to understand the questions they were asked. The interviews were recorded. Neither Defendant admitted to knowledge of the marijuana.

21.     Special Agent Rhoden testified that he has worked as a DEA agent for almost nine years. Agent Rhoden did not recall seeing the black bag. Agent Rhoden acknowledged that the crucial legal issue in a case such as this is whether each defendant had knowledge of the marijuana. The seal is critical evidence for proving this element of the Government's case. Any evidence that the seal belonged to one or other Defendant would also be critical to the determination of who

---

[11]   Government Exhibit 8 is the advise or rights and waiver form for Mr. Bernard. Government Exhibit 9 is the advise or rights and waiver form for Mr. Campbell.

had knowledge and who did not.  The black bag might have contained prescription medication bottles, receipts, fingerprints, or other evidence that might have established ownership of the bag by one of Defendants or by a third party.

22.     Mr. Bernard and Mr. Campbell are black men.  Officer Strain did not select Defendants tractor-trailer for inspection because Mr. Bernard is black.  Officer Strain selected the tractor-trailer for inspection before he was able to determine the racial characteristics of the occupants.  Officer Strain was unable to see the race of the individuals in the tractor because it was 10:00 p.m. at night and the distance between the drive window and the approaching tractor was too great to allow a person standing in the drive window to determine the racial characteristics of the occupants.

23.     Officer Strain keeps most of his narrative and supplemental reports on a jump drive and submits all his reports to his agency.  Officer Strain has arrested persons categorized as white, Hispanic, and black.  Since December 2005, Officer Strain has been directly involved in the apprehension of approximately twenty loads of contraband at the Lordsburg Port of Entry.  Not all of the twenty loads have involved black individuals.  In the four or five federal prosecutions in which Officer Strain has testified, all the defendants have been black.  Officer Strain is a defendant in the case styled *Blackwell v. Denko, et al.,* and numbered, CIV 09-0377 MCA/WPL.[12]  In *Blackwell*, the plaintiff, a black truck driver, alleged that Officer Strain and other NMMTD officers at the Lordsburg Port of Entry target vehicles driven by black men for detention, inspection, and search.  The *Blackwell* case is set for trial before Judge Armijo in November 2010.

24.     Investigator Apodaca testified that he has been employed by the Federal Public

---

[12]   Defense Exhibit D is a copy of the First Amended Complaint filed in the *Blackwell* case.

Defender's Office in Las Cruces for three years.  Before his employment with the Federal Public Defender, he worked for three years as a Court Security Officer with the United States District Court in Las Cruces.  Investigator Apodaca retired after serving as an officer with the Las Cruces Police Department for twenty-one and a half years.  For thirteen and a half of those years, Investigator Apodaca served as an investigator with the Las Cruces Police Department.

25.     On three occasions, between the months of March and April 2010, Investigator Apodaca visited two truck stops, located off Interstate 10 in or near Las Cruces.[13]  At the truck stops, Investigator Apodaca parked near the tractor-trailer rigs and spoke with individuals walking out of the terminals.  Several people did not want to talk with him.  Inspector Apodaca spoke only with those individuals who were willing to talk to him.  He did not ask their names, their level of experience, or the time of day when they passed through the Lordsburg Port of Entry.

26.     Inspector Apodaca interviewed seven white people.  Two of the white people had been checked at the Lordsburg Port of Entry; five of the white persons had not been checked.  One white person felt he had been harassed by a female inspector with white hair.  Inspector Apodaca interviewed seven Hispanic persons.  Five of the Hispanic individuals had been checked at the Lordsburg Port of Entry; two of the Hispanics had not been checked.  Two of the Hispanics felt that they had been harassed, one by a Spanish inspection officer and the other by a slender inspection officer and a stocky, muscular male inspector.  Inspector Apodaca interviewed six black men.  Four of the black men had been checked at the Lordsburg Port of Entry; two of the black men had not been checked.  One black man said he had been harassed by a chunkier male inspector and a muscular inspector.

---

[13]   Las Cruces is approximately 115 miles east of Lordsburg.

27. Investigator Apodaca has worked on six truck driving cases in the three years he has been employed by the Federal Public Defender's Office in Las Cruces.  All six of the defendants in those cases were black.  Investigator Apodaca reviewed the records for the Federal Public Defender's Office in Las Cruces going back five to six years.  The total number of such cases was seventeen. The defendants were black in sixteen of the seventeen cases.  Investigator Apodaca did not determine whether any additional trucking cases had been handled by CJA panel attorneys or privately-retained attorneys.

28. The Court reserves ruling on the credibility of Officer Strain's testimony as to the decision to select Defendant's rig for inspection.  Officer Strain's testimony was fully credible on all other matters.

29. The Court fully credits the testimony of Officer Candelaria and Investigator Apodaca.

## CONCLUSIONS OF LAW

**I.    The Court reserves ruling on the selective-enforcement claim.**

1. Defendants assert that they were the victims of selective enforcement of the law in violation of the Equal Protection Clause of the Fifth Amendment.  "[T]he Constitution prohibits selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813 (1996).  "Racially selective law enforcement violates this nation's constitutional values at the most fundamental level; indeed, unequal application of criminal law to white and black persons was one of the central evils addressed by the framers of the Fourteenth Amendment." *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1168 (10th Cir. 2003).

2. At the same time, the Supreme Court has yet to decide whether suppression is an appropriate remedy for a violation of the Equal Protection Clause.  *See United States v. Armstrong*, 517 U.S. 456, 461 n. 2 (1996) (stating that Court has not decided whether dismissal of indictment

or other sanction is proper remedy if defendant has been the victim of selective prosecution based on race).  While the Tenth Circuit has not spoken on this issue, the Sixth Circuit has suggested that a 42 U.S.C. § 1983 action against the offending officer, rather than suppression of the evidence or dismissal of the indictment, provides the appropriate remedy for an equal protection violation. *United States v. Nichols*, 512 F.3d 789, 794 (6th Cir. 2008).  Other courts have recognized that the remedy for an equal protection violation in the criminal setting is uncertain.  *United States v. Williams*, 431 F.3d 296, 300 (8th Cir. 2005); *United States v. Lopez-Moreno*, 420 F.3d 420, 434 (5th Cir. 2005); *United States v. Chavez*, 281 F.3d 479, 486-87 (5th Cir. 2002).

3.      At least one district court has stated in dicta that "exclusion would seem to be the proper remedy as it is highly doubtful that civil remedies would adequately deter police agencies from engaging in this unconstitutional and blatantly reprehensible behavior."  *United States v. Benitez*, 613 F.Supp.2d 1099, 1102 n. 3 (S.D. Iowa 2009).  Despite this statement, the court in *Benitez* discussed how the law "imposes a nearly impossible burden on the Defendant" in a selective-enforcement case and held that the defendant in that case could not establish that he was stopped because of his race.  *Id*.  The Court will reserve ruling on the issue of the proper remedy for a selective-enforcement violation until it is determined whether Defendants can establish such a claim.

4.      In order to establish a selective-enforcement claim, a defendant must prove that (1) the law enforcement officer's actions had a discriminatory effect, and, (2) the officer was motivated by a discriminatory purpose.  *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006) (internal quotation and citation omitted); *see also Armstrong*, 517 U.S. at 465 (holding a defendant making a selective-prosecution claim must establish two elements: "the federal prosecutorial policy had a discriminatory effect and it was motivated by a discriminatory purpose.").

5.      In order to demonstrate discriminatory effect, the defendant "must make a credible

11

showing that a similarly-situated individual of another race could have been, but was not, stopped or arrested for the offense for which the defendant was stopped or arrested." *Alcaraz-Arellano*, 441 F.3d at 1264 (quotation omitted). The defendant may satisfy the "credible showing" requirement by identifying a similarly-situated individual or through the use of statistical evidence. *United States v. James*, 257 F.3d 1173, 1179 (10th Cir. 2001).

6.      Of course, "a defendant cannot satisfy the discriminatory effect prong by providing statistical evidence which simply shows that the challenged government action tends to affect one particular group. Rather, the proffered statistics must address the critical issue of whether that particular group was treated differently than a similarly-situated group." *James*, 257 F.3d at 1179. The Supreme Court has stated "raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants*." *United States v. Bass*, 536 U.S. 862, 864 (2002) (per curiam) (emphasis in original).

7.      The Court recognizes that it is virtually impossible to meet this burden in the selective-enforcement context. *See United States v. Mesa-Roche*, 288 F.Supp.2d 1172, 1186-88 (D. Kan. 2003) (discussing the difficulty of showing that "a similarly situated individual was not stopped" even with discovery). It is difficult to fathom how a defendant could ever show discriminatory effect in the context of a regulatory truck inspection. In order to meet their burden, Defendants must make a credible showing that a similarly situated non-black truck driver was waived through the inspection station.

8.      Additionally, Defendants face a "demanding" burden of proof on the intent prong of the selective-enforcement claim. *Alcaraz-Arellano*, 441 F.3d at 1263. They must dispel the presumption that Officer Strain has not violated the Equal Protection Clause with "clear evidence to the contrary." *Armstrong*, 517 U.S. at 465.

12

9.     Defendants must show that discriminatory intent was a "motivating factor in the decision" to enforce the criminal law against the defendant. *Alcaraz-Arellano*, 441 F.3d at 1264; *see also Villanueva v. Carere*, 85 F.3d 481, 485 (10th Cir. 1996).  Discriminatory intent can be shown by either direct or circumstantial evidence. *Id.*  (*citing United States v. Deberry*, 430 F.3d 1294, 1299 (10th Cir. 2005)).  "[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts." *Washington v. Davis*, 426 U.S. 229, 242 (1976).  For the reasons that follow, the Court will reserve ruling on the selective-enforcement claim until Defendants receive discovery.  The Court may reopen the evidentiary hearing and/or entertain supplemental briefing at the request of counsel.

**II.     Defendants are entitled to discovery on the selective-enforcement claim.**

10.     Defendants have requested discovery on the selective-enforcement claim.  In order to obtain such discovery, Defendants must satisfy a "rigorous standard" that requires them to produce "some evidence" of both discriminatory effect and discriminatory intent.  *Armstrong*, 517 U.S. at 468-70.  Notably, "the defendant must . . . make a credible showing that a similarly-situated individual of another race could have been, but was not, arrested . . ." or selected for inspection. *James*, 257 F.3d at 1179.  Due to separation-of-powers concerns, the showing necessary to obtain discovery must "itself be a significant barrier to the litigation of insubstantial claims."  *Armstrong*, 517 U.S. at 468.  "For example, the *Armstrong* Court concluded that a study which stated that 100% of the 21 U.S.C. §§ 841 and 846 cases handled by the Los Angeles Federal Public Defender's Office in 1991 involving black defendants did not tend to show discriminatory effect because the study failed to identify non-black persons who could have been prosecuted for those same offenses, but were not." *James*, 257 F.3d at 1179.

11.     The statistics in this case are alarming.  Defendants, with Officer Strain's testimony,

13

have shown that 100% of the defendants in federal court cases in which Officer Strain was directly involved have been black.  Allegations have been raised in the *Blackwell* case that Officer Strain discriminates against black truck drivers in the inspection selection process.  While the Court realizes that such allegations are unproven, Defendants have presented some evidence tending to show the existence of the essential elements of the selective-enforcement claim.  *James*, 257 F.3d at 1178.  As a result, Defendants are entitled to discovery.

12.    Defendant Bernard filed a Notice of Brady Request on January 15, 2010, in which Mr. Campbell joined.  In the request, Mr. Bernard specifically requested Officer Strain's personnel records and a list of arrests that Officer Strain has been involved in, to determine whether Officer Strain has disproportionately arrested or detained black men, and whether any of these men have lodged complaints against him.  At the hearing, counsel for Mr. Bernard requested Officer Strain's narrative reports.  At the close of the hearing, the Court asked counsel to confer on whether the Government would provide the narrative reports to defense counsel without a court order.  Upon due consideration, the Court has decided to grant Defendants' request for discovery and give them the opportunity to make their case on their selective-enforcement claim.

**III.    The search of the trailer comported with the Fourth Amendment.**

13.    Defendants challenge the search of the trailer on Fourth Amendment grounds.  Defendants acknowledge that the Tenth Circuit has upheld the constitutionality of the New Mexico regulatory scheme governing commercial carriers.  *See United States v. Vasquez-Castillo*, 258 F.3d 1207, 1211-12 (10th Cir. 2001); *United States v. Gwathney*, 465 F.3d 1133, 1139-40 (10th Cir. 2006).  They also acknowledge that Judge Armijo has held that inspectors can open packages pursuant to the regulatory scheme and also, if they have probable cause to do so. *United States v. Simpson and Newsome*, Cr. No. 09-997 MCA, and *United States v. Debrew, Sr., et. al.*, Cr. No. 09-

14

2054 MCA.

14.     Nonetheless, Defendants maintain that (1) Officer Strain impermissibly increased Mr. Bernard's detention by expanding the scope of the Level III inspection, (2) the statutory scheme did not authorize Officer Strain to open the boxes, and, (3) Officer Strain did not have probable cause to open the boxes.  (Doc. 53 at 4.)

15.     The New Mexico statute regulating commercial trucking authorizes inspectors "to inspect the vehicle and its contents to determine whether all laws and all rules and regulations of the departments of this state with respect to public safety, health, welfare and comfort have been fully complied with."  N.M. Stat. Ann. § 65-5-1(F).  The statute provides "[t]he person in charge of the port of entry may confirm the contents of the cargo . . . ."  N.M. Stat. Ann. § 65-5-1(D).  Additionally, the statute allows the inspector " to inspect the contents of the vehicle to determine whether all taxes . . have been fully paid." N.M. Stat. Ann. § 65-5-1(E).

16.     The plain meaning of the statute forecloses Defendant's argument that Officer Strain impermissibly expanded the scope of the Level III inspection.  Mr. Bernard attached to his motion to suppress evidence and  statements, a printout from the Federal Motor Carrier Safety Administration stating that a Level III inspection is a driver-only inspection.  (Doc. 53, Ex. 1.) However, Officer Strain testified that a Level III inspection at the Lordsburg Port of Entry includes cargo verification to determine whether the contents of the load match what is on the bill of lading. It is Officer Strain's practice to verify the cargo on a fairly high number of his inspections. Regardless of how the inspection is categorized, *i.e.*, as a Level III inspection or otherwise, New Mexico law clearly contemplates the confirmation of the contents of the cargo by NMMTD inspectors.  In that this practice is clearly authorized by New Mexico law, Officer Strain did not impermissibly expand the scope of the inspection.

15

17.     The Tenth Circuit has held that New Mexico's inspection system is constitutional under the regulatory search exception to the Fourth Amendment's warrant requirement. *Gwathney*, 465 F.3d at 1138-40.  Notably, the Tenth Circuit has stated "New Mexico's regulatory scheme clearly contemplates entrance into the trailer to inspect blocking and bracing, and also allows inspection of the contents of the vehicle." *United States v. Mitchell,* 518 F3d 740, 752 (10th Cir. 2008) (internal quotation omitted).

18.     The Tenth Circuit has yet to decide whether "New Mexico's regulatory scheme authorized the actual opening of boxes[.]" *Gwathney*, 465 F.3d 1140.  However, the Court concurs with the well-reasoned conclusion of Judge Armijo "that the New Mexico regulatory scheme contemplates that in order to enforce the laws of the state, investigators might be required to open containers that are found inside trailers." *See United States v. Simpson and Newsome*, Cr. No. 09-997 MCA at 8.  Officer Strain had regulatory authority to open the unlabeled boxes and cut into the packages in order to confirm their contents.

19.     In addition, Officer Strain had probable cause to search the unlabeled boxes.  "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Lyons*, 510 F.3d 1225, 1241 (10th Cir. 2007) (citation omitted).  An officer has probable cause to search a vehicle if "under the totality of the circumstances there is a fair probability that the car contains contraband or evidence." *Id.*

20.     In this case, the totality of the circumstances suggested that the non-conforming boxes might contain contraband.  The trailer doors were secured with a padlock rather than the number sealed specified by the bill of lading.  This suggested that the doors had been opened after the legitimate cargo had been loaded.  Upon entering the trailer, Officer Strain noticed the labeled boxes

16

were stacked high, suggesting that they might have been moved to make room for additional cargo. When Officer Strain retrieved the ladder, Mr. Bernard paced back and forth in a nervous manner. Upon reaching the top of one of the stacks, Officer Strain noticed a void in front of the stacks of boxes.

21.     When he looked into the void, Officer Strain observed unlabeled boxes of a different type than the rest of the load.  The unlabeled boxes lacked corner braces and were loosely wrapped in clear plastic.  These non-conforming boxes looked different from the legitimate cargo and Officer Strain had a legitimate reason (the void) to look beyond the stacks of boxes by the door.  These facts, together with the unusual entries in the logbooks, and the presence of Mr. Campbell in the passenger seat, established probable cause for Officer Strain to open the non-conforming boxes and cut into the packages located inside. *See Gwathney*, 465 F.3d at 1139.

**IV.     The black bag was lost or destroyed.**

22.     In his Motion for Independent Analysis, Mr. Campbell requested that the Court order the Government to produce the black bag so that a defense expert could examine it for fingerprints, hair and fibers, and any other forensic material that could determine the ownership of the black bag. The United States responded that the black bag is no longer in the possession of the United States and its whereabouts are unknown.  In that the United States is unable to produce that which it does not possess, Mr. Campbell's Motion for Independent Analysis must be denied.[14]

**V.     The loss or destruction of the black bag does not warrant suppression of the evidence.**

23.     Defendants seek suppression of all evidence regarding the black bag and the broken seal.  The United States responds that the exculpatory value of the black bag was not apparent and

---

[14] On January 9, 2010, the United States provided a photograph of the black bag to defense counsel. Photographs of the black bag were admitted into evidence at the hearing as Government Exhibits 6 and 7.

it did not act in bad faith.

24.     In *California v. Trombetta*, 467 U.S. 479 (1984), the Supreme Court held that "the Due Process Clause of the Fourteenth Amendment does not require [ ] law enforcement agencies [to] preserve breath samples in order to introduce the results of breath-analysis tests at trial." *Id*., 467 U.S. at 491.  The Court noted the officers in *Trombetta* were "acting in good faith and in accord with their normal practice." *Id.*, 467 U.S. at 488 (quotations omitted).  It further concluded that any duty the Due Process Clause imposes on the government to preserve evidence, "must be limited to evidence that might be expected to play a significant role in the suspect's defense." *Id.*

25.     To meet this standard of constitutional materiality, destroyed evidence must (1) possess exculpatory value which was apparent before it was destroyed, and (2) be of such a nature that the defendant could not obtain comparable evidence by other reasonably available means. *Trombetta*, 467 U.S. at 489.

26.     In *Arizona v. Youngblood*, 488 U.S. 51 (1988), the Court extended *Trombetta* and held that, where the government fails to preserve "evidentiary material of which no more can be said than it could have been subjected to tests, the results of which might have exonerated the defendant," no due process violation occurs unless the defendant demonstrates the government acted in bad faith. *Youngblood*, 488 U.S. at 57.  Therefore, under *Youngblood*, to demonstrate a due process violation based on the government's failure to preserve potentially exculpatory evidence, the defendant must show (1) the evidence was "potentially useful," and (2) the government acted in bad faith. *Youngblood*, 488 U.S. at 58.

27.     Mr. Bernard and Mr. Campbell contend that *Trombetta* applies to their claim concerning the destruction of the black bag. (Doc. 50 at 3.)  Knowledge of the presence of marijuana is a critical issue in this case.  Possession of the broken seal would be probative of knowledge.

18

Evidence linking the black bag, and by implication the seal, to the other Defendant, or a third party, would have been potentially exculpatory and material to the defense.  Mr. Bernard and Mr. Campbell wished to inspect and test the black bag and its contents for evidence that would establish its true owner.  While tests establishing the ownership of the black bag would have been helpful to the defense, the exculpatory value of the bag was not apparent within the meaning of *Trombetta*.  *See United States v. Beckstead*, 500 F.3d 1154, 1159-61 (10th Cir. 2007) (discussing how exculpatory value of meth lab equipment seized from co-defendant's apartment and defendant's car was not apparent).  In that the exculpatory value of the black bag hinged on potential test results that might have been obtained, the exculpatory value was not apparent at the time the black bag was destroyed. *See United States v. Bohl*, 25 F.3d 904, 910 (10th Cir. 1994).

28.      In that the black bag did not have apparent exculpatory value within the meaning of *Trombetta*, Defendants must show bad faith under *Youngblood*.  The inquiry into bad faith looks to the government's knowledge of the exculpatory value of the evidence at the time it was destroyed. *See Bohl*, 25 F.3d at 911 (*citing Youngblood*, 488 U.S. at 57).  Defendants bear the burden to prove bad faith by the government. *Bohl*, 25 F.3d at 913.  Mere negligence in failing to preserve evidence is insufficient.  *Bohl*, 25 F.3d at 912.

29.      The Tenth Circuit has identified five factors relevant to the bad faith determination: (1) whether the Government had explicit notice that defendant believed the evidence to be potentially exculpatory; (2) whether defendants' assertion that the evidence possessed potential exculpatory value was merely conclusory or was supported by objective, independent evidence; (3) whether the government had possession of or the ability to control disposition of the evidence at the time it received notice of its potential exculpatory value; (4) whether the destroyed evidence was central to the government's case; and (5) whether the government offers an innocent explanation for its failure

19

to preserve the evidence.  *Bohl*, 25 F.3d at 911-13; *see also Beckstead*, 500 F.3d at 1159-61.

30.     In this case, the Government did not have explicit notice that the Defendants believed the evidence to be potentially exculpatory until after the black bag was lost.  While testing of the black bag might have indicated who owned it, the black bag is not central to the Government's case. The Government has explained that the black bag was not retained because Special Agent Rhoden did not deem it pertinent to the investigation and the loss of the bag was, at most, negligent.  (Doc. 62.)  This explanation is reasonable.  Under the circumstances, the Court concludes that the Defendants have not met their burden of showing bad faith.

**VI.     The statements were obtained in compliance with the Fifth Amendment.**

31.     Defendants move for suppression of their statements on the grounds that the statements were obtained in violation of *Miranda v. Arizona*, 384 U.S 436 (1966) and the waivers were involuntary.  A crime suspect subjected to custodial interrogation has a privilege against compulsory self-incrimination.  *Id.*, 384 U.S. at 444-45.  The Fifth Amendment privilege is protected by the *Miranda* rule, which mandates that statements taken during a custodial interrogation cannot be admitted at trial to establish the guilt of the accused unless the government has provided the accused with a full and effective warning of his rights at the outset of the interrogation process, and the accused has voluntarily, knowingly, and intelligently waived his rights.  *Id.*  The testimony of Officer Candelaria that he advised each Defendant of his rights, as well as the statement of rights forms, initialed and executed by each respective Defendant, demonstrates that the Defendants were provided with full and effective *Miranda* warnings.

32.     If a defendant talks to the law enforcement officer, after being advised of his right to remain silent, the government bears the burden of proving by a preponderance of the evidence that the waiver of rights was voluntary. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).  "To establish

20

a waiver of Fifth Amendment rights, the government must show (1) that the waiver was voluntary in the sense that it was a product of free and deliberate choice rather than intimidation, coercion, or deception; and (2) that the waiver was made in full awareness of the nature of the right being waived and the consequences of waiving." *United States v. Hernandez*, 93 F.3d 1493, 1501 (10th Cir. 1996). The voluntariness of a waiver is evaluated based on the totality of the circumstances surrounding the interrogation. *Id.*

33. Relevant circumstances the Court must consider in evaluating voluntariness include (1) the presence or absence of police coercion, (2) the length, location, and continuity of the interrogation, (3) the accused's maturity, education, physical condition, and mental health, and (4) whether law enforcement officials advised the accused of his rights. *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993).

34. Defendants were in custody at the time they signed the waivers and made the statements. Neither Defendant made any statement that indicated he desired the assistance of counsel during the interviews. Officer Candelaria advised each Defendant of his rights at the beginning of each interview. Each Defendant executed a separate waiver of rights form. Each Defendant demonstrated that he understood his rights by placing his initials by each statement of rights. None of the officers coerced Defendants into making the statements. The interviews occurred within six hours of the arrests. Mr. Bernard's interview lasted less then thirty minutes. Defendants are adults and were alert during the interviews. The transcripts of the interviews indicate that Defendants are intelligent and understood the nature and content of the questions. (Docs. 81-1 and 81-2.)

35. Based on the totality of the circumstances surrounding the interrogations, the Government has established that (1) the waivers were voluntary in that they were the product of free and deliberate choice rather than intimidation, coercion, or deception, and (2) the waivers were made

in full awareness of the nature of the rights being waived and the consequences of waiving those rights.  The statements were obtained in compliance with *Miranda*.  The Government has satisfied its burden to establish that the waivers and statements were voluntary and freely given.

**THEREFORE,**

**IT IS ORDERED** that Defendant Campbell's Motion for Independent Analysis (Doc. 49), filed on January 12, 2010, Defendant Bernard's Motion to Suppress All Evidence Relating to Trailer Seal (Doc. 50), filed on January 15, 2010, and Defendant Bernard's Motion to Suppress Evidence and Statements (Doc. 53), filed on January 15, 2010, as to all issues, other than the selective-enforcement claim, are **DENIED.**

**IT IS FURTHER ORDERED** that Mr. Bernard's Notice of Brady Request (Doc. 51), filed on January 15, 2010, is **GRANTED.**

**IT IS FURTHER ORDERED** that the Court will reserve ruling on the selective-enforcement claim contained in Defendant Bernard's Motion to Suppress Evidence and Statements until such matter is ripe for adjudication.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**